Filed 5/5/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B338176 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 24LBCF00269) |
| v. | |
| VINCENT FRANCIS TOURVILLE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Marcelita V. Haynes, Judge.  Reversed with directions.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Zee Rodriguez, Supervising Deputy Attorney General, and Michael C. Keller, Deputy Attorney General, for Plaintiff and Respondent.

_____

1

The trial court denied Vincent Francis Tourville's motion for pretrial mental health diversion under Penal Code section 1001.36[1] but offered that if he entered a no contest plea to the charged offense, the court would place him on probation to complete the same mental health and substance abuse treatment program he would have completed under mental health diversion. Tourville did just that and now appeals from the judgment entered after he pleaded no contest to felony corporal injury to spouse.

Where, as here, the trial court finds the defendant eligible and suitable for diversion (including a finding the defendant does not pose an "unreasonable risk of danger to public safety" under the statute), requiring the defendant to plead no contest to the charged offense in order to obtain the treatment necessary to address a mental disorder is directly at odds with the statute's purpose to treat individuals with mental disorders in the community instead of their entering or reentering the criminal justice system. This is especially so where the court orders the identical treatment program in the community that the defendant would have entered under diversion.

In this case, the trial court found that Tourville, a military veteran, acted violently in attacking the mother of his newborn child and had a history of violence. On this basis the court doubted whether two years (under the diversion statute) would be sufficient time to treat Tourville's post-traumatic stress disorder (PTSD) and alcohol abuse disorder and to protect the victim and the public, absent supervision by the probation department. Although a trial court has residual discretion to

---

[1]     Further statutory references are to the Penal Code.

deny diversion for reasons consistent with the purposes of the statute, the court's denial of diversion based on the perceived risk to the victim and public, despite a finding that Tourville did not pose an unreasonable risk of danger to public safety, was an abuse of discretion. We reverse the judgment and direct the court to vacate the order denying Tourville's motion for mental health diversion and to enter a new order granting the motion unless there is evidence of changed circumstances that provides a basis for denying the motion.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Offense*

In February 2024 Tourville and E.C. lived in an apartment with their newborn son. On February 22 police officers responded to a radio call and found E.C. with the four-day-old baby in a store parking lot. According to the police report, E.C. told the officers that she was home with the baby in the early morning when Tourville came home intoxicated. Tourville picked the baby up from his crib and held him while stumbling around. E.C. became concerned, took the baby from Tourville's arms, and returned him to his crib. Tourville became enraged and slapped E.C. multiple times, leaving injuries under her eyes. He grabbed her, threw her to the ground, and kicked her in the vagina. Tourville then mounted E.C. and began strangling her with one hand while smothering her with the other, causing her almost to lose consciousness.

Tourville got off E.C., hid E.C.'s phone and debit card, and went to their bedroom, where he fell asleep. After a few hours, E.C. took their baby and some belongings and left the apartment on foot while Tourville was sleeping. E.C. had sustained injuries

3

to her face, arms, and neck. She told the police that she and Tourville had been dating for two years and had lived together for the past year. During that period, Tourville hit her in the face numerous times, but she did not report the incidents to the police because she was too scared. The prosecution filed a complaint charging Tourville with one count of corporal injury on a spouse resulting in a traumatic condition. (§ 273.5, subd. (a).)

B.    *Tourville's Motion for Mental Health Diversion*

On March 4, 2024 Tourville's attorney filed a motion for mental health diversion pursuant to section 1001.36. The motion argued Tourville was eligible for diversion because he was diagnosed with PTSD from his military service in Iraq and drank alcohol to suppress his symptoms. Further, his mental disorder was a significant factor in his commission of the offense. The motion asserted Tourville met the suitability criteria under section 1001.36, subdivision (c), because he consented to diversion; he waived his right to a speedy trial; he was an appropriate candidate for diversion through a United States Department of Veterans Affairs (Veterans Affairs) treatment program that would address his PTSD, substance abuse, and domestic violence; he did not pose an unreasonable risk of committing a "super strike" under the statute; and he did not face prosecution for any offense that would render him ineligible for diversion.

Tourville submitted multiple letters from social workers at Veterans Affairs supporting mental health diversion. A letter from Veterans Affairs licensed clinical social worker Freda Ayers provided information on Tourville's prior treatment through Veterans Affairs. Tourville first received mental health and psychiatric treatment in 2017 for depressive disorder. Since that

4

time Tourville had connected with Veterans Affairs in Los Angeles and received mental health and substance abuse treatment for his PTSD, anxiety disorder, and alcohol use disorder. Most recently, he had a psychiatry appointment on January 30, 2024 and was scheduled for a follow-up psychiatry appointment on April 15.

A February 2024 letter from a supervisory social worker who had interviewed Tourville described the trauma Tourville suffered in Iraq from 2009 to 2010, his diagnosis with PTSD, and his excessive use of alcohol to cope with his environment while in Iraq and to "numb and repress PTSD symptoms" upon his return. Tourville had told the social worker he wanted to start individual therapy and learn proactive coping skills to manage his drinking.

Sergio Antoniuk, a licensed clinical social worker for Veterans Affairs, stated in a March 2024 letter that a Veterans Affairs medical doctor had diagnosed Tourville with PTSD, and a Veterans Affairs psychiatrist had diagnosed Tourville with "alcohol use disorder, cannabis use disorder, and anxiety disorder." Tourville told Antoniuk that he had used alcohol excessively to address the anxiety and stress from serving in a war zone, had regularly used alcohol upon his return to cope with his trauma and civilian life, and on the day of his arrest he had consumed alcohol and other substances. Tourville acknowledged "that once he starts drinking it's difficult for him to regulate his emotions/behavior, and to control his alcohol use." Antoniuk reported that Tourville acknowledged his trauma and his need to address his PTSD, anger, and alcohol use, and he was motivated to participate in clinical treatment to address his mental health issues.

5

Antoniuk stated in a second March letter following an in-depth interview that Tourville had been accepted into the Veterans Affairs Domiciliary Residential Rehabilitation Program (DOM), which would provide dual-diagnosis treatment and medical services.  Upon completion of the DOM program, Veterans Affairs would provide outpatient individual therapy, outpatient psychiatry, and outpatient substance abuse treatment.  A letter from the Community Veteran Justice Project stated it had performed an in-custody intake, and it would provide a case worker to ensure Tourville received comprehensive services during his transition from a residential to an outpatient treatment program.

E.C. submitted a letter to the trial court in which she stated she wanted Tourville to receive treatment for his addiction and mental health issues and to break the cycle of domestic violence.  She recounted that Tourville had suffered severe sexual, physical, and mental abuse as a small child and was raised by an alcoholic caregiver and a mother who was physically abused.  Further, he suffered "severe shell shock" and a "traumatic brain injury" while in Iraq.  Tourville was a "sweet loving man" when he was sober.  She added that on the night of the abuse incident, Tourville was "so intoxicated, and not his normal self."  She urged the court to provide Tourville treatment instead of jail time.

In its opposition, the prosecution argued that Tourville did not meet the eligibility requirements under section 1001.36 because he failed, among other things, to show his mental disorder played a significant role in the offense, his disorder would respond to mental health treatment, and he would not pose an unreasonable risk of danger to public safety.  Further,

6

Antoniuk's letter failed to address Tourville's PTSD symptoms, instead focusing only on his alcohol abuse, and Tourville did not submit any mental health evaluations or military records of his service.

The opposition stated Tourville had a sustained juvenile petition for robbery in 2001, a misdemeanor conviction for evading arrest in 2007, and a 2015 misdemeanor conviction for careless driving. In addition, Tourville had arrests in 2015 for harassment and a "domestic assault" (but no conviction) and an April 2019 misdemeanor conviction for violating a protective order. The opposition asserted the domestic assault arrest related to Tourville's alleged assault of a different woman (M.D.) that occurred while Tourville was visiting their five-month-old child. Tourville claimed M.D. was the aggressor. The April 2019 violation of a protective order also involved M.D. The prosecution argued that Tourville was at risk of committing a super strike given the circumstances of the current offense.

In his reply, Tourville provided additional details on his prior criminal history, explaining with respect to the arrest for domestic assault that Tourville and M.D. each alleged the other committed an assault. There were no visible injuries, and the case was dismissed. The 2016 "harassment" referred to a police report (without an arrest) in which M.D. reported that Tourville contacted M.D. by phone, but M.D. did not want contact. In March 2019 M.D. reported to the police that she ran into Tourville at the grocery market, and he demanded to see his son. Tourville's misdemeanor conviction for violating a protective order arose out of an incident in which Tourville drove his car into the parking lot of M.D.'s apartment complex, stopped his

car, waved his hands, and appeared to yell at M.D.; M.D. was able to drive around Tourville's car and leave.

Tourville also submitted an April 8, 2024 letter from Antoniuk in which Antoniuk expressed his "professional clinical opinion" that if Tourville were to "wholeheartedly engage in residential treatment" in the DOM program and maintain ongoing outpatient mental health care, "he would more likely than not experience a clinically significant benefit."

The trial court held a hearing on Tourville's motion on April 11, 2024. At the outset of the hearing, the court stated it had read the case file, the complaint, the police reports, and the reports from mental health experts Antoniuk and Ayers. The court then inquired of Ayers and Antoniuk what treatment Tourville had received from Veterans Affairs prior to the incident with respect to PTSD, anxiety disorders, and substance abuse, and why it had not prevented him from committing the current offense. Ayers responded that in 2017 Tourville was receiving treatment at Veterans Affairs for depressive disorders, but he had never received treatment for PTSD. Antoniuk confirmed that Tourville had only received outpatient mental health treatment for depression and added that Tourville had never been in an intensive residential program that provided treatment for trauma and substance abuse.

The trial court then asked Ayers about the statement in his report that Tourville saw a psychiatrist at the Veterans Affairs facility on January 30, 2024. Ayers clarified that at the January 30 visit, Tourville was diagnosed with PTSD, but his first appointment for treatment was scheduled for April 15, 2024 (after the February incident). The court observed that E.C. had filed a letter requesting the court order treatment instead of

8

incarceration.  Tourville's attorney confirmed E.C. still wanted Tourville to receive counseling instead of jail time.

The trial court stated it had two options for treatment:  It could find Tourville eligible and suitable for diversion, or it could accept a change of plea from Tourville and place him on probation to complete the same treatment program.  The court explained it was "leaning towards probation" because "the PTSD does not appear to be a significant factor in the commission of the offense. The substance abuse does appear to be a significant factor."  The court added that "the facts of the case lead me towards not granting diversion."

Tourville's attorney argued the mental health diversion statute was enacted to assist defendants like Tourville, a veteran who had served in combat with a diagnosis of PTSD and alcohol and substance abuse.  Further, Tourville's prior contacts with police included a few arrests and misdemeanor convictions, but no felonies or crimes involving a weapon.  In addition, the prosecution's prior offer for Tourville to submit to treatment instead of jail time showed that the prosecution was amenable to Tourville being released.  Accordingly, Tourville did not pose an unreasonable risk of danger to public safety.

The prosecutor argued that neither Tourville's PTSD nor his alcohol use was a significant factor in the commission of the offense, noting Tourville had received mental health services in the past but continued to commit domestic violence.  Further, Tourville had been hitting E.C. on a regular basis.  The trial court rejected this argument, stating "there's no doubt in the court's mind that the substance abuse was a significant factor in the commission of the offense."  The court also found that Tourville did not pose a risk of committing a super strike.

However, the trial court expressed a concern that given Tourville's history of violence and the violent nature of the crime, even if Tourville was eligible, "the crime may not be suitable for diversion." The court stated it was "stuck on the facts of the crime" and explained, "The nature of kicking someone four days after the birth of their child in the vagina is, I don't think, suitable for diversion."

The trial court continued, "The issue is whether diversion is an appropriate vehicle where I become the probation officer, and I don't have time to be his probation officer. If I put him in treatment on probation, I've got the treatment team, Ms. Ayers and the treatment team at the DOM, [as] well as the probation officer that is overseeing this." The court added, "I don't think that two years, given his history, given the facts of this case, given his diagnosis [of PTSD], is a suitable time frame for the court to protect the public and protect the alleged victim."

At the conclusion of the hearing the trial court denied Tourville's motion, stating, "I don't think [the offense is] suitable for diversion. I'm offering him . . . time served and treatment through the V.A. and probation."

C. *Tourville's No Contest Plea and Sentencing*

On April 12, 2024 Tourville waived his rights and pleaded no contest to felony corporal injury to spouse. The trial court suspended imposition of sentence and placed Tourville on three years of formal probation on the condition he serve 101 days in county jail with credit for time served and conduct credits. The court ordered, among other conditions, that Tourville be released to Veterans Affairs to enroll in and complete the DOM residential treatment program for a minimum of 90 days (and a maximum of one year), followed by an outpatient treatment program as

10

directed by Veterans Affairs or the court.  In addition, the court ordered Tourville to complete a 52-week domestic violence counseling program through Veterans Affairs; to submit to periodic testing for narcotics, controlled substances, and alcohol; and not to drink or possess any alcoholic beverages, use or possess marijuana, or use or possess any narcotics or restricted drugs without a prescription.  The court also ordered Tourville to obey a protective order requiring him to have no contact with and stay 100 yards away from E.C. and where she lives, works, or goes to school (except for the safe exchange of children pursuant to a court order), and not to harass or use or threaten to use force or violence against E.C.  The court said to Tourville, "I'm taking faith in you that you really want to change and be a different person and treat the demons that have been chasing you for so long."  Tourville responded that he wanted to change for himself and his family.

Tourville timely appealed, and the trial court granted his request for a certificate of probable cause.[2]

## DISCUSSION

A.     *Governing Law and Standard of Review*

Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders.  (*People v. Frahs* (2020) 9 Cal.5th 618, 626; *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147-1148

---

[2]     A defendant may appeal the denial of pretrial diversion following a plea of guilty or no contest by obtaining a certificate of probable cause.  (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147; *People v. Padfield* (1982) 136 Cal.App.3d 218, 228.)

11

(*Whitmill*).)  Under pretrial diversion, the trial court may postpone prosecution at any time in the judicial process, either temporarily or permanently, to allow the defendant to undergo mental health treatment.  (*Frahs*, at p. 626; *Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 133 (*Vaughn*); *Whitmill*, at p. 1148.)  "The Legislature intended the mental health diversion program to apply as broadly as possible."  (*Whitmill*, at p. 1149; see *Frahs*, at p. 632.)

Under section 1001.36, a defendant must be both eligible and suitable for mental health diversion.  A defendant is eligible under section 1001.36, subdivision (b), if (1) the defendant has been diagnosed by a qualified mental health expert with a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders; and (2) the defendant's mental disorder was a significant factor in the commission of the charged offense.  (See *Vaughn, supra*, 105 Cal.App.5th at p. 133; *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 891 (*Sarmiento*).)

The statute specifies four factors that must be met for a defendant to be suitable for diversion: (1) in the opinion of a qualified mental health expert the defendant's mental disorder would respond to treatment; (2) the defendant consents to diversion and agrees to waive his or her speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) if treated in the community, the defendant will not pose an "unreasonable risk of danger to public safety" as defined in section 1170.18.  (§ 1001.36, subd. (c)(1)-(4); *Sarmiento, supra*, 98 Cal.App.5th at pp. 891-892.)  Section 1001.36, subdivision (e), places the burden on the defendant "to make a prima facie showing that the defendant will meet the minimum requirements

12

of eligibility for diversion and that the defendant and the offense are suitable for diversion." (*See Vaughn, supra*, 105 Cal.App.5th at p. 134.)

"An unreasonable risk of danger to public safety as defined in section 1170.18, subdivision (c), means "'an unreasonable risk that the [defendant] will commit a new violent felony'" within the meaning of section 667, subdivision (e)(2)(C)(iv), which felonies are 'colloquially referred to as "super strikes.'" [Citation.] 'Those super strikes are murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14.'" (*Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 679 (*Gomez*); accord, *Whitmill, supra*, 86 Cal.App.5th at p. 1149; *People v. Moine* (2021) 62 Cal.App.5th 440, 449-450.) "Thus, the risk of danger is narrowly confined to the likelihood the defendant will commit a [super strike]." (*Moine*, at p. 450; accord, *Gomez*, at p. 690; *Whitmill,* at p. 1151; *People v. Williams* (2021) 63 Cal.App.5th 990, 1001.) In addition, under section 1001.36, subdivision (d), defendants are not eligible for mental health diversion if they are charged with murder, voluntary manslaughter, an offense requiring sex offender registration (except for indecent exposure), specified sex offenses, or offenses involving weapons of mass destruction.

If the defendant makes a prima facie showing that he or she meets all the statutory eligibility and suitability criteria, the trial court still has discretion to deny diversion. (*People v. Cabalar* (2025) 117 Cal.App.5th 41, 53 (*Cabalar*); *Vaughn, supra*, 105 Cal.App.5th at p. 134; *Sarmiento, supra*, 98 Cal.App.5th at

13

p. 892.)  In the amendments effective January 1, 2023, the Legislature "underscored that diversion is not mandatory by adding an express reference to the court's discretion that did not previously exist:  'On an accusatory pleading alleging the commission of a [qualifying offense], the court may, *in its discretion*, . . . grant pretrial diversion.'" (*Cabalar*, at p. 54, citing § 1001.36, subd. (a), italics added; see Senate Bill No. 1223 (2021-2022 Reg. Sess.); Stats. 2022, ch. 735, § 1 (Senate Bill 1223).) "Notably, the 2023 amendments did not change permissive language in the very provision of the statute which empowers the trial court to grant pretrial mental health diversion in the first instance.  Both before and after the amendments, the statute says a court 'may' grant diversion to a defendant who meets the specified statutory criteria." (*Cabalar*, at pp. 53-54.)

However, "while it is clear a trial court retains 'residual' discretion to deny diversion even if all the threshold requirements are met, that does not mean . . . [the court] could reject a request for diversion based on an alternative meaning of 'public safety' inconsistent with the specific statutory definition in section 1001.36, subdivision (c)(4).  In the guise of exercising its 'residual' discretion, a court is not permitted to redefine public safety in a manner inconsistent with the Legislature's expressed intent." (*Sarmiento, supra*, 98 Cal.App.5th at p. 896; accord, *Gomez, supra*, 113 Cal.App.5th at p. 691 ["The trial court cannot invoke its residual discretion to create a lower standard for finding that the facts and circumstances of the robbery indicate diversion would not protect public safety."].)

We review the trial court's decision to grant or deny a motion for mental health diversion for abuse of discretion. (*Vaughn, supra*, 105 Cal.App.5th at p. 135; *Whitmill, supra*,

14

86 Cal.App.5th at p. 1147.)  A court abuses its discretion when it makes an arbitrary decision by applying the wrong legal standard or bases its decision on express or implied factual findings that are not supported by substantial evidence. (*Vaughn*, at p. 135; *Whitmill*, at p. 1147.)

B.    *The Trial Court Abused Its Discretion in Finding Tourville Was Unsuitable for Diversion*

Tourville contends the trial court abused its discretion in finding he was unsuitable for mental health diversion based on the violent nature of the crime and the court's reluctance to supervise Tourville's rehabilitation in place of a probation officer. He also argues the court erred in considering whether he could be rehabilitated within two years.  The Attorney General responds that the court properly considered these factors as part of its residual discretion to deny mental health diversion.  We agree with Tourville that the court abused its discretion.

As discussed, the trial court found Tourville was eligible for mental health diversion under section 1001.36, subdivision (b), in that (1) qualified medical experts at Veterans Affairs recently diagnosed Tourville with PTSD and alcohol use disorder; and (2) Tourville's substance abuse was a significant factor in the commission of the offense.  In addition, the court found the disputed suitability factors under section 1001.36, subdivision (c), were met:  Antoniuk opined that treatment in the DOM residential program for Tourville's PTSD and substance abuse was more likely than not to result in a "clinically significant benefit" to Tourville, and Tourville did not pose a risk of committing a super strike.  The other two factors were not in dispute:  Tourville consented to diversion and waived his speedy

15

trial rights, and he agreed to comply with the Veterans Affairs treatment program requirements.

Notwithstanding the trial court's finding that Tourville met the suitability factors under section 1001.36, subdivision (c), the court found the facts of the offense—that Tourville violently kicked E.C. in the vagina and strangled her just four days after giving birth to their child—rendered the offense not "suitable for diversion." A trial court may consider the circumstances of the offense in deciding whether the defendant's mental disorder was a significant factor in the commission of the charged offense, or whether the defendant is likely to commit a super strike, but it is not otherwise a listed factor for determining a defendant's eligibility or suitability for diversion under section 1001.36, subdivisions (b) and (c).

To the extent the trial court was exercising its residual discretion to deny diversion based on the violent nature of Tourville's abuse of E.C. and his history of domestic violence to protect E.C. and the public, this was simply another way of stating that Tourville posed an unreasonable risk of danger to public safety without supervision by the criminal justice system—a finding defined by statute to include only the risk he would commit a super strike. (*Gomez, supra*, 113 Cal.App.5th at p. 691; *Sarmiento, supra*, 98 Cal.App.5th at p. 897.)

As the court in *Sarmiento* explained, denial of diversion based on risk factors beyond the statutory factors would be inconsistent with the legislative purposes of the statute, observing "the Legislature has made it abundantly clear that for persons with diagnosed disorders, mental health treatment provides the best strategy for breaking the cycle of criminal recidivism." (*Sarmiento, supra*, 98 Cal.App.5th at p. 897; accord,

16

*Gomez, supra*, 113 Cal.App.5th at p. 691; *People v. Qualkinbush* (2002) 79 Cal.App.5th 879, 891-892 (*Qualkinbush*).)

Our dissenting colleague concludes the language of section 1001.36, subdivision (a) (in stating a trial court "may, in its discretion" grant diversion), and the legislative history of the mental health diversion statute support a contrary holding—that a court may exercise its discretion to deny mental health diversion where the defendant poses a serious risk of danger to public or victim safety even if the defendant, as here, is not likely to commit a super strike. (Dis. opn., *post*, at pp. 2-3.)

The dissent's position would be more compelling if section 1001.36, subdivision (c)(4), stated as a suitability requirement that the trial court must find the defendant "will not pose an unreasonable risk of danger *that the defendant will commit a super strike*." But it does not. Section 1001.36, subdivision (c)(4), instead states the court must find the defendant "will not pose an unreasonable risk of danger *to public safety, as defined in section 1170.18*." (Italics added.) And section 1170.18, subdivision (c), clarifies that an "unreasonable risk of danger to public safety" is defined as an unreasonable risk of committing a super strike. Thus, the Legislature has specifically defined what constitutes "an unreasonable risk of danger to public safety" under the statute, limiting it to the danger the defendant will commit a super strike.

As a matter of statutory interpretation, we cannot interpret a trial court's discretion under section 1001.36, subdivision (a), to include denial of mental health diversion based on a finding of an unreasonable risk of danger to public safety that is inconsistent with the definition of that term in subdivision (c)(4). (See *Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 804 ["'We do

17

not consider statutory language in isolation; instead, we examine the entire statute to construe the words in context.'"]; *People v. Shabazz* (2006) 38 Cal.4th 55, 67-68 ["An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in light of the statutory scheme"].)

Moreover, in interpreting the Legislature's intent in enacting the mental health diversion statute, many courts have relied on the stated purpose of the statute in section 1001.35, subdivisions (a) and (c), to promote "[i]ncreased diversion of individuals with mental disorders to mitigate the individual's entry and reentry into the criminal justice system while protecting public safety" and to "provid[e] diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (See *Gomez, supra*, 113 Cal.App.5th at p. 691; *Vaughn, supra*, 105 Cal.App.5th at p. 138; *Sarmiento, supra*, 98 Cal.App.5th at p. 69; *Whitmill, supra*, 86 Cal.App.5th at p. 1149; *Qualkinbush, supra*, 79 Cal.App.5th at pp. 891-892 [trial court abused its discretion in finding defendant was unsuitable for mental health diversion based on use of force in committing crime and history of violence, contrary to "the goals of promoting increased diversion of individuals with mental disorders to mitigate their entry and reentry into the criminal justice system while protecting public safety"].)

The dissent criticizes this line of cases, arguing that in focusing on the legislative goal to increase diversion, these cases failed to consider the related goal of "protecting public safety," citing the dissent in *Sarmiento, supra*, 98 Cal.App.5th at page 909 (dis. opn. of Irion, J.). (See dis. opn., *post*, at pp. 3-4.)

18

However, as the Legislature made clear in Senate Bill No. 215 (2017-2018 Reg. Sess.) (Senate Bill 215), which amended section 1001.36 a few months after the diversion statute was enacted,[3] providing greater opportunities for mental health diversion protects public safety by rehabilitating mentally ill individuals and reducing the rate at which they reoffend. According to the Assembly Committee on Public Safety's report on Senate Bill 215, in describing the need for the bill, "'[b]ecause diversionary sentences take advantage of existing community resources for the mentally ill, research suggests that such sentences will save counties money in the short-term on reduced trial and incarceration costs, and in the long-term *based on reduced recidivism rates*.'" (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 215 (2017-2018 Reg. Sess.) as amended Jan. 25, 2018, p. 5, italics added; see Sen. Floor Analysis Unit, Sen. 3d reading analysis of Sen. Bill No. 215 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018, p. 3 [same].)  The Assembly Committee on Appropriations analysis of Senate Bill 215 likewise stated that

---

[3]     The Legislature enacted sections 1001.35 and 1001.36 as part of Assembly Bill No. 1810 (2017-2018 Reg. Sess.), which was an omnibus budget bill that took effect immediately. (Stats. 2018, ch. 34, § 24; see *People v. Frahs, supra,* 9 Cal.5th at p. 626.)  Senate Bill 215 amended section 1001.36 to provide in subdivision (b)(2) that murder, rape, and other specified crimes are ineligible for diversion.  (See *Frahs*, at p. 627.)  The Supreme Court in *Frahs* considered Senate Bill 215 in discerning the Legislature's intent in enacting section 1001.36 just a few months earlier.  (See, e.g., *Frahs*, at p. 635 [noting the analysis of Sen. Bill 215 found that "community-based treatment for a mentally ill individual costs much *less* than jailing the same individual, and greatly reduces recidivism"].)

mentally ill defendants whose mental illness may have contributed to their crime "are likely to reoffend if they do not receive treatment for their underlying mental illness." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 215 (2017-2018 Reg. Sess.) as amended June 14, 2018, p. 1.)

The dissent also relies on the analysis by the Senate Committee on Public Safety with respect to Senate Bill 1223 (and a similar analysis by the Assembly Committee on Public Safety), which cite a portion of a memorandum prepared by Judge J. Richard Couzens (Ret.), titled Memorandum RE: Mental Health Diversion (Penal Code §§ 1001.35-1001.36) (AB 1810 & SB 215) [revised] (Nov. 14, 2018) (Couzens memorandum). (See Sen. Com. on Public Safety, Rep. on Sen. Bill No. 1223 (2021-2022 Reg. Sess.) March 9, 2022, p. 7.) The Couzens memorandum, as quoted in the Senate committee report, states in a section titled "Mental Health Diversion Law" that "[t]he law gives discretion to courts to grant diversion if the minimum standards are met, and, correspondingly, refuse to grant diversion even though the defendant meets all of the requirements." (*Id*. at pp. 6-7, boldface omitted.) The memorandum then lists a number of reasons the trial court might deny mental health diversion despite a defendant meeting the minimum standards, including the lack of availability of a suitable treatment program for a defendant with a higher disability level; a defendant's history of treatment that shows the prospects of success in another diversion program are poor; the defendant's conduct in prior treatment programs makes the defendant unsuitable; and a mental health court would provide a

better alternative (for example, a different diversion program).[4] (*Ibid*.) We agree with this portion of the analysis.

As the dissent points out at pages 5 and 6, however, the committee reports also cite, in describing the then-existing mental health diversion law, a portion of the Couzens memorandum that states, "'Clearly the court is not limited to excluding persons only because of the risk of committing a "super strike"—the right to exclude because of dangerousness goes well beyond that limited list.  In short, the court may consider *any* factor relevant to whether the defendant is suitable for diversion.'"  (See Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1223 (2021-2022 Reg. Sess.) as amended June 23, 2022, p. 5.) We do not find the March 2022 committee reports' citation to

---

[4]    To some extent, these examples of discretion may fall within the suitability requirement in section 1001.36, subdivision (c)(1), that "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment."  However, a qualified expert could opine that the defendant's symptoms would respond to mental health treatment yet there are no treatment programs available for the defendant's specific needs, or under a prior grant of diversion, the defendant could have consistently relapsed or continued to commit crimes before the end of the program.  As to the fourth example in the Couzens memorandum, if a trial court offers a different mental health diversion program that better suits the defendant's mental health needs and meets the Legislature's goals in enacting the mental health diversion program, it would be a reasonable exercise of discretion for the court to grant the defendant diversion under that program, as long as the program does not require the defendant to plead to the underlying charges.

21

Judge Couzens's November 2018 memorandum interpreting the existing law persuasive in determining the Legislature's intent in enacting section 1001.36 in June 2018.

As the Supreme Court explained in *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473, "[I]f the courts have not yet finally and conclusively interpreted a statute and are in the process of doing so, a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration. [Citation.] But even then, 'a legislative declaration of an existing statute's meaning' is but a factor for a court to consider and 'is neither binding nor conclusive in construing the statute.' [Citation.] This is because the 'Legislature has no authority to interpret a statute. That is a judicial task. The Legislature may define the meaning of statutory language by a present legislative enactment which, subject to constitutional restraints, it may deem retroactive. But it has no legislative authority simply to say what it *did* mean.'" (See *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244 ["there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the two bodies. [Citation.] Nevertheless, the Legislature's expressed views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them."].)[5]

---

[5] We note the same analysis by the Senate Committee on Public Safety on Senate Bill 1223 again made clear that the Legislature's intent in enacting section 1001.36 was to protect public safety by increasing diversion of mentally ill defendants into treatment programs instead of incarceration. (See Sen. Com.

22

Since 2021 the appellate courts have consistently interpreted the mental health diversion statute to limit a trial court's discretion to deny diversion based on a risk of danger to public safety to the likelihood the defendant will commit a super strike. (See *People v. Moine, supra*, 62 Cal.App.5th at p. 450; *People v. Williams, supra*, 63 Cal.App.5th at p. 1001; *Whitmill, supra*, 86 Cal.App.5th at p. 1151; *Sarmiento, supra*, 98 Cal.App.5th at p. 897; *Gomez, supra*, 113 Cal.App.5th at p. 690.) "[T]he Legislature is presumed to know about existing case law when it enacts or amends a statute." (*In re W.B.* (2012) 55 Cal.4th 30, 57; accord, *People v. Rhodius* (2025) 17 Cal.5th 1050, 1062.) We assume, therefore, that the Legislature was aware of the appellate courts' consistent interpretation of a court's limited discretion to deny mental health diversion based on a risk to public safety, yet the Legislature has amended section 1001.36 seven times since 2022 without amending the language used in section 1001.36, subdivision (c)(4).[6]

on Public Safety, Analysis of Sen. Bill No. 1223 (2021-2022 Reg. Sess.) March 9, 2022, p. 9 ["'California enacted AB 1810, which authorized courts to divert people with mental health conditions . . . out of the carceral system and into treatment. By ensuring that these people are connected to meaningful, long-term mental health treatment instead of simply jailed and released, the diversion statute *protects public safety* by lowering recidivism rates . . . and leads to better outcomes for these individuals and their families.'" (Italics added.)].)

[6]    See Sen. Bill No. 184 (2021-2022 Reg. Sess.); Stats. 2022, ch. 47, § 38, eff. June 30, 2022; Sen. Bill No. 1223 (2021-2022 Reg. Sess.); Stats. 2022, ch. 735, eff. Jan 1, 2023; Assem. Bill No. 455 (2023-2024 Reg. Sess.); Stats. 2023, ch. 236, § 1, eff. Jan. 1, 2024; Assem. Bill No. 1412 (2022-2023 Reg. Sess.); Stats. 2023, ch. 687, § 1.2, eff. Jan. 1, 2024; Sen. Bill No. 159 (2023-2024

A pending bill proposed in February 2026 would replace the language in section 1001.36, subdivision (c)(4) (defining an unreasonable risk of public safety to be the risk of committing a super strike), with a requirement that "[t]he defendant will not pose a *substantial and undue risk to the physical safety of another person* if treated in the community." (Sen. Amend. to Assem. Bill No. 1373 (2025-2026 Reg. Sess.) April 15, 2026, p. 4.)[7] The bill also adds to the list of excluded charged offenses, "[c]orporal injury . . . that causes great bodily injury." (*Id*., p. 6.) The analysis by the Senate Committee on Public Safety states the author proposed the legislation to prevent misuse of mental health diversion ""as a get-out-of-jail-free" card by violent criminals,'" noting the bill "'restores judicial discretion to make evidence-based decisions, and prioritizes public safety and victims' rights, while allowing legitimate cases to qualify for mental health treatment.'" (Sen. Com. on Public Safety, Rep. on Sen. Bill No. 1373 (2025-2026 Reg. Sess.) April 15, 2026, p. 5.) As part of its analysis, the committee report cites to *Sarmiento*,

---

Reg. Sess.); Stats. 2024, ch. 40, § 30, eff. June 29, 2024; Sen. Bill No. 1323 (2023-2024 Reg. Sess.); Stats. 2024, ch. 646, § 1, eff. Jan. 1, 2025; Sen. Bill No. 1400 (2023-2024 Reg. Sess.); Stats. 2024, ch. 647, § 1.5, eff. Jan. 1, 2025.

[7] Legislation was proposed in 2025, specifying that "the court retains the discretion [pursuant to subdivision (a)] to deny pretrial diversion if it concludes that, despite the proposed treatment program and any available terms and conditions of diversion, the defendant poses an unreasonable risk to the physical safety of another." (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 483 (Reg. Sess. 2025-2026) as amended July 9, 2025, p. 2.) However, the bill was held in the Senate Appropriations Committee.

*Whitmill*, *Qualkinbush*, and *Vaughn*, consistent with our presumption that the Legislature is aware of existing case authority. (See Sen. Com. on Public Safety, Rep. on Sen. Bill No. 1373, at pp. 6-7.)

If the Legislature believes the trial courts should have greater discretion to deny diversion based on other public safety factors, it can pass legislation to do so. We recognize there are policy reasons for the courts to have greater discretion to deny mental health diversion, as well as reasons to limit judicial discretion to expand access to mental health diversion. That is a policy decision for the Legislature to make in the first instance, and until it does, we interpret the mental health diversion statute consistent with the current language and legislative intent in enacting the statute.

Requiring Tourville to plead no contest to the charged offense to obtain the treatment he needs for his mental disorders is directly at odds with the legislative purpose to provide mental health diversion as broadly as possible to keep individuals with mental health disorders out of the criminal justice system, especially given that the proposed program under diversion (the Veterans Affairs DOM program followed by outpatient treatment) is the same program the court imposed as a condition of probation. (See *Qualkinbush*, *supra*, 79 Cal.App.5th at p. 892, fn. 9 ["The fact that the court granted probation and imposed a condition that Qualkinbush be released to a residential treatment program suggests that the court implicitly found that Qualkinbush in fact would not pose a danger to the community if released from custody."].)

The Attorney General contends the trial court acted within its residual discretion in finding that Tourville "could benefit

more from the treatment team that would be available to him on probation than if he was placed on [mental health] diversion." The court's conclusion that the mental health diversion program would not provide adequate supervision without the oversight of the probation department ignores the safeguards built into the statutory diversion program.  As the Court of Appeal explained in *Cabalar, supra,* 117 Cal.App.5th at page 58, "A person granted mental health diversion will be undergoing inpatient or outpatient treatment (§ 1001.36, subd. (f)(1)), and the statute requires '[t]he provider of the mental health treatment program in which the defendant [is] placed [to] provide regular reports to the court, the defense, and the prosecutor on the defendant's progress in treatment' (*id.*, subd. (f)(1)(B)).  In addition, if the person 'is performing unsatisfactorily in the assigned program,' (*id.*, subd. (g)(4)(A)), or is charged with an additional offense or is engaging in criminal conduct during diversion, the court must hold a hearing to determine whether to, inter alia, modify treatment or reinstate criminal proceedings.  (*Id.*, subd. (g).)" (Fn. omitted.)

As the court in *Cabalar* concluded, "[T]o the extent the court in this case relied on a lack of ability to monitor a person's activity and progress while participating in diversion as a basis for denial of Cabalar's motion, it did so in reliance on an incorrect statement of the law."  (*Cabalar, supra*, 117 Cal.App.5th at pp. 58-59.)  The court in *Cabalar* noted, for example, that "[t]he statutory scheme leaves it to the trial court to use its discretion to establish, with input from the parties, the particularities of the regular reporting, which may include, for example, the required frequency, the necessary level of detail, and/or circumstances triggering a need for immediate notice to the court."  (*Id*. at p. 59,

26

fn. 7; see § 1001.36, subd. (*l*) [referring to progress reports].) We also see no reason why the trial court in this case could not have required Veterans Affairs to provide periodic drug testing (a typical part of a drug treatment program) to ensure Tourville's compliance with the terms of diversion. In addition, the statute provides that the prosecution may request the court order a defendant be prohibited from possessing a firearm until the defendant successfully completes diversion. (§ 1001.36, subd. (m)(1).)

In this case, Tourville will have the benefit of oversight by Veterans Affairs (during both inpatient and outpatient services) and a dedicated case worker from the Community Veteran Justice Project to ensure he receives the necessary services. Although Tourville would not need to report to a probation officer on a monthly basis, the court could have required that Veterans Affairs provide monthly progress reports to the court and counsel, thus alerting the court promptly if Tourville had relapsed or otherwise was not in compliance with the treatment program. This would minimize any risk of Tourville leaving the program early without the court promptly learning of the noncompliance or relapse. We recognize the court's concern that it does not "have time to be [Tourville's] probation officer," and certainly reviewing the treatment team's progress reports will consume valuable court time. But that is part of the court's role as envisioned by the mental health diversion statute, in an effort to keep as many individuals as possible out of the criminal justice system while protecting public safety.

In addition, Tourville sought out treatment from Veterans Affairs and was motivated to obtain treatment to change his behavior. As Antoniuk opined, "The fact [Tourville] has been able

27

to clearly acknowledge his trauma, identify his errors in turning to substances, and that he has been able to look beyond the rigid repressive coping style instilled by the military and start to share his emotional struggles speaks to his sincere willingness to work toward change." We agree with the dissent that there will be cases where probation will best serve a defendant with a mental disorder (dis. opn., *post*, p. 10), but the decision that a probationary sentence is necessary in lieu of mental health diversion must be made consistent with the purposes of the statute. The trial court, in assuming it could only protect public safety by placing Tourville under the watchful eye of the probation department, was assuming at the outset that Tourville would otherwise fail, contrary to the legislative preference for treatment of mental health disorders outside of the criminal justice system.

In denying Tourville's motion, the trial court also improperly considered whether a two-year mental health treatment program would be sufficient to address Tourville's mental health disorders. We recognize a trial court's legitimate concern that a defendant like Tourville—with a history of violence who has committed a violent offense—could undergo treatment for two years then commit another offense (even a violent offense). But nowhere in section 1001.36 is there a requirement that a court find a defendant will be rehabilitated within a specified period of time in order to be suitable for diversion. Further, the diversion statute has built-in guardrails: Prosecution of a criminal felony offense is postponed for a period of two years to allow for mental health treatment (§ 1001.36, subd. (f)(1) & (1)(C)(i)), and criminal proceedings may be reinstated under specified circumstances, including if the

defendant engages in new criminal conduct or performs unsatisfactorily in the treatment program (*id*., subd. (g)(1)-(4)).

The trial court's denial of diversion based on the possibility that it would take longer than two years for Tourville to address his mental disorders turns the statute on its head by deciding in advance that the treatment would not be successful instead of allowing two years to see if treatment can succeed, and only reinstating criminal proceedings if it does not. Further, the Legislature has made clear its view that an eligible defendant who does not pose a risk of committing a super strike, if provided the necessary treatment, is less likely to re-offend, and instead will break the cycle of entering and reentering the criminal justice system.

The Attorney General suggests that if we find the trial court failed adequately to state its reasons for exercising its discretion to deny diversion, we should conditionally reverse for the court to "provide a more robust explanation of its decision." However, given our rejection of the reasons argued by the Attorney General to support the court's exercise of its residual discretion and that two years have passed since the court denied Tourville's motion for mental health diversion, we reverse the judgment and order the court to vacate its order denying the motion. We direct the court to enter a new order granting Tourville's motion for mental health diversion unless there is evidence of changed circumstances that provide a basis for denying the motion consistent with this opinion, in which case the court shall hold a further hearing on the motion.

## DISPOSITION

The judgment is reversed.  We direct the trial court to vacate the order denying Tourville's motion for mental health diversion and to enter a new order granting the motion unless there is evidence of changed circumstances that provide a basis for denying the motion consistent with this opinion.  If the court finds changed circumstances, it shall hold a further hearing on Tourville's motion for mental health diversion consistent with this opinion.


FEUER, J.

I concur:


SEGAL, Acting P. J.

STONE, J., Dissenting.

I respectfully disagree that the trial court abused its discretion in denying defendant Vincent Tourville mental health diversion under Penal Code section 1001.36[8] based on its concerns for public and victim safety. Section 1001.36, subdivision (a), gives trial courts discretion to consider a defendant's dangerousness beyond whether he or she is likely to commit the most serious type of crimes (super strikes). Appellate courts that have found to the contrary too narrowly construe the Legislature's stated purposes for the diversion statute and have not accounted for the legislative history that demonstrates the Legislature specifically intended to give trial courts this discretion.

Nor did the trial court abuse its discretion in determining that, although Tourville was not a good candidate for diversion, it would be appropriate to place him on three years of formal probation with the same proposed treatment plan he would have received during a two-year diversion period. Faulting courts for granting probation after denying diversion could have the perverse effect of leading courts to send more defendants with mental health issues to prison instead of allowing them to be treated in the community. Depending on the circumstances, there is still a place for probation with mental health treatment when a court denies diversion.

---

[8]  Undesignated code references are to the Penal Code.

1

A.	*The Legislature Intended for Courts To Exercise Broad Discretion in Deciding Whether To Grant Diversion, Including Determining Whether the Risk to Public or Victim Safety Is Too Great*

The majority holds that a trial court may deny mental health diversion based on public or victim safety concerns only if it determines the defendant is likely to commit a super strike, and that it may not consider such concerns in exercising its residual discretion.  (Maj. opn., *ante*, at pp. 14-15.)  The plain language of section 1001.36, the Legislature's general description of its purpose in section 1001.35, and the legislative history on this issue compel the conclusion that the trial court's discretion is not so limited.

Subdivision (a) of section 1001.36 provides that "the court *may, in its discretion,* ... grant pretrial diversion to a defendant pursuant to this section if the defendant satisfies the eligibility requirements for pretrial diversion set forth in subdivision (b) and the court determines that the defendant is suitable for that diversion under the factors set forth in subdivision (c)."  (Italics added).  The majority recognizes that even if a defendant makes a prima facie showing he or she meets all the statutory eligibility and suitability criteria set forth in subdivisions (b) and (c), the trial court still has discretion under subdivision (a) to deny diversion.  (Maj. opn., *ante*, at pp. 13-14, citing *Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 134 (*Vaughn*); see *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080 ["Ultimately ... diversion under section 1001.36 is discretionary, not mandatory, even if all the requirements are met."].)  However, the majority follows other appellate courts that have concluded residual discretion under subdivision (a) of section 1001.36 does not allow

2

for consideration of public or victim safety concerns.  (Maj. opn., *ante*, at pp. 16-17.)  Those courts reason that the statute constrains courts to considering the narrow question of whether the defendant is likely to commit a super strike, in which case the defendant is disqualified from consideration for diversion under section 1001.36, subdivision (c)(4).  (See *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 691; *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 897.)  But the eligibility and suitability factors in subdivisions (b) and (c) of section 1001.36 merely set the minimum threshold that a defendant must satisfy to be considered at all for diversion.  If the court determines a defendant is likely to commit a super-strike offense, that defendant is barred from further consideration.  On the other hand, if the court determines a defendant is *not* likely to commit a super strike, nothing in section 1001.36 hinders the court from considering, as part of its exercise of discretion under subdivision (a), whether there are other serious public or victim safety concerns short of a likelihood the defendant will commit one of the most serious crimes possible.  (See *Sarmiento*, at p. 909 (dis. opn. of Irion, J.) [concluding that if a defendant does not pose a risk of committing a super strike but does pose an unreasonable risk of committing some other violent crime, the trial court may consider that risk in combination with other factors and exercise its residual discretion to deny diversion].)

Courts that have adopted a contrary conclusion have assumed that to deny diversion based on lesser (but still serious) public and victim safety concerns would be inconsistent with the legislative purposes of the statute.  They rely on the Legislature's stated purpose "to promote ... [i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and

3

reentry into the criminal justice system while protecting public safety."  (§ 1001.35, subd. (a); see, e.g., *Gomez v. Superior Court, supra*, 113 Cal.App.5th at p. 691.)  However, in focusing only on the intent to "increase[] diversion," they neglect the corresponding goal of "protecting public safety."  (§ 1001.35, subd. (a); compare *Sarmiento, supra*, 98 Cal.App.5th at p. 890 with *id.* at p. 909 (dis. opn. of Irion, J.).)  Honoring that " '[t]he Legislature intended the mental health diversion program to apply as broadly as possible' " (*People v. Frahs* (2020) 9 Cal.5th 618, 632) does not require disregarding its simultaneous intention to protect public safety.

The legislative history of the current version of section 1001.36 (i.e., the version that governs Tourville's case) unambiguously demonstrates the Legislature's intention that courts have discretion to deny diversion under section 1001.36 based on public and victim safety concerns, short of a likely super strike.  When considering 2022 amendments to section 1001.36 in Senate Bill No. 1223 (2021-2022 Reg. Sess.), both the Assembly and the Senate Committees on Public Safety spelled out this intent.  (See *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218, fn. 3 [legislative committee analyses provide "direct windows into legislative intent"].)  The Senate Committee analysis states:  "The law gives discretion to courts to grant diversion if the minimum standards are met, and, correspondingly, refuse to grant diversion even though the defendant meets all of the requirements:  'There may be times, because of the defendant's circumstances, where the interests of justice do not support diversion of the case.  *The defendant's criminal or mental health history may reflect a substantial risk the defendant will commit dangerous crimes beyond the "super*

4

*strikes" identified in section 1001.36, subdivision (b)(6)* [now subd. (c)(4)]. ... *Clearly the court is not limited to excluding persons only because of the risk of committing a "super strike" – the right to exclude because of dangerousness goes well beyond that limited list.* In short, the court may consider *any* factor relevant to whether the defendant is suitable for diversion.' (J. Couzens, Memorandum RE: Mental Health Diversion (Penal Code §§ 1001.35-1001.36) (AB 1810 & SB 215) [revised] (Nov. 14, 2018), p. 4 ....)" (Sen. Com. on Public Safety, Rep. on Sen. Bill No. 1223, as amended Mar. 9, 2022, p. 7, first set of italics added.) The subsequent report by the Assembly Committee on Public Safety repeated these statements, including the quotation from Judge Couzens's analysis. (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1223, as amended June 23, 2022, p. 5.) Both the Assembly and Senate Committees thus agreed with Judge Couzens that section 1001.36 grants trial courts broad discretion, including to deny diversion when the court perceives an unreasonable risk the defendant will commit dangerous crimes other than super strikes.

The majority concludes the Senate and Assembly Committees' analyses *in 2022* do not persuasively show the Legislature's intent in *2018* when it enacted the original mental health diversion statute.[9] (Maj. opn., *ante*, at pp. 21-22.) But

---

[9]    In fact, earlier legislative history reveals that all along the Legislature intended to give trial courts discretion to consider public safety concerns in exercising their discretion whether to grant mental health diversion. (See Assem. Com. on Public Safety, Rep. on Sen. Bill No. 215 (2017-2018 Reg. Sess.) as amended Jan. 25, 2018, p. 7 ["Under the provisions of this bill, it is permissive for a judge to grant diversion when the conditions set forth in this bill exist. The permissive nature of this bill

5

this legislative history illuminates the Legislature's intent in 2022 as it amended the provision addressing courts' residual discretion—a hot issue as Senate Bill No. 1223 evolved.  Because one of the bill's proposed amendments to section 1001.36 created a rebuttable presumption that a defendant's mental disorder was a significant factor in the commission of the offense, stakeholders were concerned that trial court discretion to deny diversion would be curtailed.  (See, e.g., Sen. Becker, author of Sen. Bill No. 1223, mem. in response to opposition letter of Cal. Dist. Atty. Assn., Apr. 30, 2022, p. 1.)  Thus, the Legislature proposed another amendment to underscore that courts would retain their discretion under subdivision (a) of section 1001.36 to deny diversion, despite the rebuttable presumption that was created. (See Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1223, as amended June 29, 2022, p. 1 [emphasizing the bill " 'preserves judicial discretion' "].)  The final result was that while the previous version of section 1001.36, subdivision (a), specified a court "may" grant diversion, the revised version effective 2023 states a court "may, *in its discretion*," grant diversion.  (Sen. Bill No. 1223, *supra*, as amended June 29, 2022, italics added; see Assem. Com. on Appropriations, Analysis of Sen. Bill No. 1223, as amended June 29, 2022, p. 3.)[10]  The

_____

would provide judges the discretion to admit or deny a defendant with specified mental health issues to the diversion program. *If a judge feels that a defendant's participation in a diversion program is not appropriate from the standpoint of public safety*, or any other reason, the judge can prohibit the defendant from participating in diversion."  (Italics added)]; see *Vaughn, supra*, 105 Cal.App.5th at p. 134 [citing same].)

[10]     "It stands to reason ... that the simultaneous addition of 'in its discretion' [in the 2022 amendments to section 1001.36]

6

legislative history of Senate Bill No. 1223 as a whole reflects that, in amending section 1001.36 to state that a court "may, in its discretion, ... grant pretrial diversion," the Legislature intended that discretion to include the authority to deny diversion because the court deems the defendant too much of a public or victim safety risk, even if the court does not conclude the defendant is likely to commit a super strike. (Sen. Bill No. 1223, *supra*, as amended June 29, 2022.)

Tourville's dangerousness was the overarching concern for the trial court in denying diversion. The court noted Tourville's prior domestic violence history with another partner, including an arrest for domestic assault in 2015 and restraining order violations in 2019.[11] The court concluded, "He's got a history of violence, whether or not he was actually convicted of it. ... The fact is that his child was born on February 18th ... [and] on February 22nd, he slaps victim in the face, threw her to the ground, kicks her in the vagina, and then strangles her. ... Where I'm stuck is that the crime may not be suitable for diversion."

Given Tourville's domestic violence history and the facts of the offense, the court could find diversion was inappropriate

_____

alongside the new presumptions was meant to balance out those presumptions by giving the courts greater discretion (albeit a power rooted in notions of justice and equity ...) over the decision to grant or deny diversion." (Couzens, Bigelow & Prickett, Sentencing California Crimes (The Rutter Group 2025 ed.) § 7:21.)

[11] That previous partner informed the police that Tourville assaulted her in her home and destroyed her clothing when he came to visit their infant, and she reported several instances of Tourville violating the restraining order, including an instance where he was demanding to see their child.

because of safety concerns for the victim and her infant child (and others), even if the court did not believe Tourville would try to murder them or commit another disqualifying super strike. Curtailing the exercise of such residual discretion is not consistent with the language of section 1001.36, its stated purposes, or the Legislature's intent evidenced by the legislative history.  (See *Vaughn*, *supra*, 105 Cal.App.5th at p. 135 [exercise of residual discretion must be " ' "consistent with the principles and purpose" ' " of § 1001.36].)

B.     *The Court's Decision To Deny Diversion But Grant Probation Was Not Inconsistent*

The majority also concludes it was improper for the trial court to deny diversion but to offer the Tourville formal probation, during which he would receive the same treatment proposed for diversion.  (Maj. opn., *ante*, at p. 2.)  I disagree that doing so was at odds with the purposes of the diversion statute. The court did not abuse its discretion in determining that for Tourville to be treated in the community, public and victim safety concerns called for the additional safeguards and lengthier period of supervision that being on probation would provide.

The trial court explained why diversion was not appropriate for Tourville but probation was:  "I don't think that two years [on diversion], given his history, given the facts of this case, given his diagnosis, is a suitable time frame for the court to protect the public and protect the alleged victim."  On the other hand, the court stated, "If I put him in treatment on probation, I've got the treatment team, [a Veterans Affairs social worker,] and the treatment team at the [Department of Mental Health], [as] well as the probation officer that is overseeing this."  Thus, while the court agreed treatment in the community was

8

appropriate, it determined Tourville needed the additional supervision the Probation Department could provide, and it believed the mandatory three-year probation period of supervision[12] (as opposed to the two-year maximum diversion period under section 1001.36, subdivision (f)(1)(C)(i)) was necessary given Tourville's history, his diagnosis, and the circumstances of the offense.  When the court placed Tourville on three years of formal probation, it imposed (among other conditions) search and seizure conditions; a firearms prohibition; and drug testing as directed by the Probation Department, Veterans Affairs, the court, or a law enforcement officer.[13]  The court's reasoning and this disposition of Tourville's case did not run afoul of any purpose or principle of the diversion statute.

"[T]he 'strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community' should inform a trial

_____

[12] Conviction of a domestic violence-related crime like the one with which Tourville was charged is subject to special terms of probation, including a three-year minimum probation period. (§ 1203.097, subd. (a)(1).)

[13] The court found Tourville was a military veteran who was suffering from post-traumatic stress disorder and substance abuse stemming from his service and thus qualified for the special ameliorative provisions of section 1170.9.  As a result, if Tourville completed his mental health treatment and was in substantial compliance with his probation conditions, he could be considered for early termination of probation as well as the "dismissal of the action" that would release him from "all penalties and disabilities resulting from the offense," subject to some limited exceptions.  (§ 1170.9, subd. (h)(1), (2)(C), (3)(A), (4)(A).)

court's discretion" in deciding whether to grant mental health diversion.  (*Vaughn, supra,* 105 Cal.App.5th at p. 138.)  Courts must apply the Legislature's mandate to grant diversion to as many qualifying individuals as they can, consistent with the purposes of the statute.  Because Tourville had never before received treatment for his post-traumatic stress disorder and appeared committed to addressing his longstanding mental health and substance abuse issues, the trial court appropriately found Tourville should be treated in the community.  However, there is still a place for probation with mental health treatment when a court finds diversion is not appropriate based on public safety concerns.  Because Tourville had engaged in a pattern of domestic violence involving multiple partners and past restraining order violations, culminating in a very violent episode, the court did not abuse its discretion in determining he required the additional protections and the extra year of supervision that being placed on probation would afford.

I do not think we should signal to trial courts that the only two options available to a defendant seeking diversion are diversion or prison time—not probation.  Nor do we want to discourage prosecutors from recommending probation for particular defendants as opposed to prison, even if they opposed diversion.  Doing so could lead to more defendants with mental illness in prison, not more receiving treatment in the community.

The majority relies on the recent decision in *People v. Cabalar* (2025) 117 Cal.App.5th 41, which held that a trial court may not deny diversion based on the court's perceived lack of ability to monitor a defendant on diversion, because the diversion statute requires that "[t]he provider of the mental health treatment program in which the defendant has been placed shall

10

provide regular reports to the court, the defense, and the prosecutor on the defendant's progress in treatment." (§ 1001.36, subd. (f)(1)(B); see *Cabalar*, at pp. 58-59.) But the requirement of reports from programs does not ensure the same supervision and accountability that the Probation Department can provide. For example, although section 1001.36 does not set any minimum frequency for updates, trial courts (in Los Angeles County at least) typically set progress hearings every three months for defendants on mental health diversion. These defendants generally request progress letters from their programs to bring to progress hearings. But when defendants leave their programs prematurely and do not show up for hearings, courts are often in the dark about their status. Not infrequently, courts will belatedly learn that defendants left their programs months earlier. While some programs may notify courts directly about defendants' progress or advise that they have left, that is not statutorily required and is not the norm.

Although defendants on probation also sometimes go "AWOL," the Probation Department's monthly check-in requirement enables an earlier discovery of their absence. The Probation Department can notify the court and ask for bench warrants to issue for these defendants. In addition to the monthly check-ins, defendants on probation are typically (as here) subject to search and seizure conditions and additional alcohol and narcotics testing. Trial courts should be able to consider whether these additional safeguards are necessary, including to protect public or victim safety.

I acknowledge a court will have *some* public safety concerns in most criminal cases in which a defendant seeks diversion. A court cannot lawfully deny diversion in every case under the

11

rationale that probation will provide extra guardrails to protect the public and victims.  But we should trust bench officers to exercise their residual discretion consistently with the Legislature's intent that the mental health diversion statute apply as broadly as possible and to deny diversion only "where the purposes of the statute would not be achieved."  (*Vaughn, supra*, 105 Cal.App.5th at p. 138.)

I respectfully dissent.


STONE, J.